DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which entered a judgment denying appellant Lucas County Children's Services Board's ("LCCS") motion for permanent custody. For the reasons that follow, we affirm the trial court's decision.
 {¶ 2} Appellee, Jacalyn H., is the natural mother of KaShaun H., born in October 1999, Iesha H., born in December 2000, Egypt H., born in April 2002, and Jamel H., born *Page 2 
in November 2003. Appellee is the stepmother of Ckalvin S., born in November 1998.[1] On April 21, 2003, LCCS filed a complaint in dependency and neglect and motion for shelter care hearing.[2] The complaint alleged that the housing conditions were "deplorable," that the children were unkempt, that appellee and her husband, Deon H., were smoking marijuana in front of the children, that appellee was pregnant (with Jamal H.) and smoking marijuana daily, and that Deon had "smacked and pushed" appellee and "slammed" her to the floor when he was aware that she was pregnant.
 {¶ 3} On April 21, 2003, a shelter care hearing was held and the children were placed in the interim temporary custody of the children's paternal aunt, Tandelaya B. Thereafter, on June 19, 2003, the children were adjudicated to be dependent; on September 19, 2003, the trial court awarded temporary custody to Tandelaya B. Appellee was also placed in the Lucas County Family Drug Court Program.
 {¶ 4} On December 5, 2003, LCCS filed a motion to change disposition and for shelter care hearing. The motion claimed that Tandelaya's husband, Lamar B., who has an extensive criminal record, was residing in the home (contrary to Tandelaya's assurances to LCCS) and that he was left alone with the children. Thereafter, effective *Page 3 
December 15, 2003, temporary custody was awarded to LCCS. The children were placed in foster care.
 {¶ 5} On December 1, 2003, following Jamel's birth, LCCS filed a complaint in dependency and motion for shelter care hearing. A shelter care hearing was held and temporary custody of Jamel was awarded to LCCS. On January 22, 2004, Jamel was found to be a dependent child. Temporary custody was awarded to LCCS.
 {¶ 6} During the course of the proceedings, appellee participated in the case plan services; Deon H. did not participate. On June 14, 2004, legal custody of Jamel was returned to appellee; on July 6, 2004, appellee regained legal custody of Egypt, Iesha, and KaShaun. Protective supervision of all four children was awarded to LCCS.
 {¶ 7} On August 25, 2004, LCCS filed a motion to change disposition of the above named children and requested emergency shelter care. The motion alleged that, on August 23, 2004, appellee had a party at her home that included alcohol and drug use. LCCS further stated that appellee left her children with caretakers for extended periods of time. Interim temporary custody of the children was awarded to LCCS.
 {¶ 8} On November 5, 2004, LCCS was awarded temporary custody. On February 3, 2005, LCCS filed a motion for permanent custody. Appellee opposed the motion and a trial was conducted on August 23, August 26, and October 4, 2005.
 {¶ 9} At trial, the following evidence was presented. LCCS caseworker, Dan Klepacz, testified that LCCS first became involved with the family in 1991, due to physical abuse allegations and a poor home environment. In 1998, after several years of *Page 4 
LCCS involvement, the children (Anthony and Courtney) were removed from the home and placed with a relative for approximately two weeks.
 {¶ 10} Klepacz testified that LCCS continued to have contact with the family. There were ongoing concerns regarding physical abuse, filthy living conditions, no food or utilities, lack of adult supervision, and drug usage. In 2003, following a domestic violence incident where appellee was injured by Deon in front of the children, the children were again removed from the home. Temporary legal custody was awarded to LCCS and the children were in foster or relative placement.
 {¶ 11} Klepacz stated that in August 2003, there were allegations of sexual abuse against Deon by his stepdaughter, Courtney, and that he is currently incarcerated for the rape of Courtney. Klepacz testified that he believed that appellee was still married to Deon but currently she has no contact with him.
 {¶ 12} Klepacz acknowledged that appellee completed programs in domestic violence, parenting, and substance abuse. Appellee also completed Drug Court and has adequate housing. Klepacz stated that he was hesitant to reunify appellee with her children because he did not believe that she was able to "internalize" what she had learned in the programs. In other words, appellee had to be specifically directed to do things; she had trouble making her own decisions.
 {¶ 13} In June 2004, when the children were reunified with appellee, she was working for a taxi service and the children were in day care approximately 18 hours per day. Klepacz testified that the children were in day care so long because of appellee's *Page 5 
work schedule, the meetings she had to attend, and her need to sleep. The children were often with their paternal grandmother and sometimes with their foster parents.
 {¶ 14} Klepacz testified that in August 2004, he made an unannounced visit to appellee's home; he was allowed in by the children's paternal grandmother. Klepacz stated that he found the home littered with garbage, empty beer bottles, and empty cigar boxes with tobacco that had been emptied from them (Klepacz believed that the cigars had been refilled with marijuana.) Klepacz went upstairs and found two men sleeping on mattresses on the floor. He left because he felt uncomfortable.
 {¶ 15} Klepacz later discussed the party with appellee. According to Klepacz, appellee stated that the children were not in the house at the start of the party; it was her intent that the party would be over when the children arrived home. Appellee was not aware of marijuana at the party. Appellee told Klepacz that the men that were asleep upstairs were too intoxicated to drive home.
 {¶ 16} The above event led to the children's removal. Klepacz stated that LCCS did not offer any additional services but that appellee, on her own initiative, began working with Family Services of Northwest Ohio and the Genesis Program for domestic violence.
 {¶ 17} Shortly after the children's removal, appellee allowed another party to occur at her home. Klepacz stated that appellee had allowed a woman named Anna to move into her home; appellee told him that one night she went downstairs and observed Anna "partying" with two men and consuming drugs and alcohol. *Page 6 
 {¶ 18} Klepacz testified that he had concerns regarding appellee's relationships with men. He stated that appellee often associates with men with criminal backgrounds; some with prior sex offense convictions.
 {¶ 19} With regard to visitation with the children, Klepacz testified that appellee had trouble controlling the children and that she is not paying attention to them. Klepacz stated that appellee enlists the older children to supervise the younger ones.
 {¶ 20} Klepacz explained that the children are now in foster care: Jamel and Egypt are together and Iesha, Ckalvin, and KaShaun are together. Besides the one removal, Jamel has been in the same foster home since birth. Egypt has been placed in five different homes due to his behavior issues. Iesha has been "sexually acting out;" she has been imitating oral sex on both brothers and "dry humping" them. KaShaun is very active and Ckalvin is angry and defiant.
 {¶ 21} Klepacz testified that LCCS filed a motion for permanent custody because appellee was not benefiting from services; she continued to place her interests before her children's. Klepacz testified that he believed that an award of permanent custody to LCCS was in the children's best interests.
 {¶ 22} During cross examination, Klepacz acknowledged that appellee tested negative for drugs following the party that caused the children's removal. Klepacz further testified that when appellee discovered a second party at her home she kicked the people out, including Anna. Appellee voluntarily told Klepacz about the party. Klepacz acknowledged that he had not heard of any men in appellee's life since she completed Project Genesis. *Page 7 
 {¶ 23} Regarding visitation, Klepacz stated that it takes place on Saturdays at Children Services. Klepacz stated that five to seven children (four under the age of six) are included in the visitation and that it is held in a room the size of an average bedroom.
 {¶ 24} With regard to Iesha's sexually acting out, Klepacz stated that it was first reported in January 2005, approximately five months after she was removed from appellee's home. Iesha has been in counseling. According to Ckalvin, who is seven, they learned the sexual behaviors from mommy and daddy. Klepacz acknowledged that the sexual behaviors did not begin until two and one-half years after they were removed from their father.
 {¶ 25} Clinical therapist, Kelly Loeffler, testified that she has been counseling Egypt. Loeffler diagnosed him with adjustment disorder, or a difficulty adjusting to change. Loeffler stated that Egypt had a lot of aggression. Initially, Egypt had difficulty attaching to his foster mother; now they are bonded and doing well. Loeffler testified that Egypt needs a very stable home where the caretaker is willing to continue with his treatment.
 {¶ 26} Jennifer Beck, a clinical therapist from Connecting Point, testified that she has been counseling Courtney for about a year and a half. Courtney was diagnosed with Post Traumatic Stress Disorder with emotional instability, anger outbursts, and some depressive symptoms.
 {¶ 27} At appellee's initiative, Beck did begin meeting with both Courtney and appellee. Beck said that Courtney and appellee seemed comfortable with each other; Courtney would often lean on appellee's shoulder and play with her hair. *Page 8 
 {¶ 28} Beck felt that during the Children Services visitations Courtney had been placed in a caretaking role. Courtney also expressed that she misses her siblings and wished she could have more contact with them.
 {¶ 29} LCCS Family Visits Manager, Michelle Myers, testified next. Myers testified that she supervises Saturday visits between appellee and her children. Myers testified that the atmosphere during visitation is often chaotic and loud; there is not a lot of control or supervision. Myers stated that, on occasion, she has had to intervene but that appellee does try to control the situation. Myers said that they have suggested different kinds of activities that appellee could do with the children; she stated that appellee does not do any of the activities and there is a lack of constructive play. Myers did state that the children are very happy to see appellee, that they are affectionate with her, and that she returns the affection. Myers acknowledged that she observes seven different families on Saturdays.
 {¶ 30} Larry Vacant, also of LCCS, testified that he acted as appellee's community advocate during the reunification process. His role was to make sure that housing was stable as well as any other needs of the children. Specifically, Vacant testified that he was working with appellee in obtaining furniture for her house.
 {¶ 31} Vacant testified that there was a delay getting the children's beds put together. Appellee was asked to put the beds, or bed frames, together on multiple occasions. *Page 9 
 {¶ 32} When asked, Vacant expressed a few concerns about appellee's parenting skills. First, when he was coming to appellee's home for a visit he heard appellee, while he was still on the porch, yell "put the f**king mustard away." Next, was the amount of time the children spent with other caregivers. Finally, there was an instance where there were cigarette butts and paper strewn all over the floor.
 {¶ 33} During cross-examination, Vacant testified that appellee was cleaning up the mess as she was talking with him. Regarding the beds, Vacant acknowledged that there was a problem with the bed frames. Finally, Vacant testified that he never saw any males in the home.
 {¶ 34} Carla Hamilton, foster mother to Ckalvin, KaShaun, and Iesha, testified next. Hamilton testified that when Ckalvin and KaShaun first came into the home they were "headstrong," had anger issues, and rough behavior; she stated that the behaviors had improved.
 {¶ 35} Next, Hamilton testified regarding Iesha's sexual behaviors. Hamilton stated that she walked in on Iesha, then four years old, "humping" on Ckalvin. Hamilton asked where she saw that behavior; Ckalvin stated that they saw it at home. Hamilton testified that Iesha did the same thing to a boy at school. Hamilton stated that she has not seen any more behaviors since they began counseling.
 {¶ 36} During cross-examination, Hamilton agreed that the boys came to her from another foster home. Iesha, prior to being reunified with appellee, had been in a different foster home; Hamilton did not know why Iesha was not returned to that home in August 2004. *Page 10 
 {¶ 37} Robin Lapinski is the foster mother to Jamel and Egypt. She testified that she has six children of her own and three foster children. Lapinski testified that Jamel came to her as a newborn. Lapinski described Jamel as a very happy and good baby. She said that when he returned to her home after the reunification he was quiet and withdrawn.
 {¶ 38} Lapinski testified that when Egypt first came to live with her he was very defiant and angry; he was also constantly "playing with himself." Lapinski stated that Egypt's behavior has improved a lot over the past year and that he is very loving toward her. Lapinski testified that Egypt is in day care from about 9:00 a.m. until 5:00 p.m.
 {¶ 39} Jane Wurth and Cheri Miller testified that they are Court Appointed Special Advocates ("CASA") for the children. Wurth testified first and stated that she has been involved with the children since April 21, 2003. Wurth stated that she has had a lot of interaction with appellee and has been in contact with approximately 40 people regarding the case. Wurth stated that it is her recommendation that LCCS gain permanent custody of the children.
 {¶ 40} Wurth gave the following reasons for the recommendation. They (she and co-CASA Miller) believe that appellee follows orders well but lacks initiative. The utilities in appellee's house were turned off and appellee had the oven door open to supply heat; appellee did not see it as a safety hazard. There was a double bed pushed next to a broken window. Wurth testified that they believed that appellee puts other people as a priority in her life instead of her children; she also exposes them to *Page 11 
unnecessary risks, e.g., various men in and out of the house. Finally, Wurth stated that they have observed a "slacking off of appellee's personal commitment to her children.
 {¶ 41} During cross-examination, Wurth testified that appellee never missed a scheduled home visit. Wurth also testified that the children have a wonderful relationship with their paternal grandmother and that she does a great job caring for them.
 {¶ 42} Co-CASA, Cheri Miller, testified next. Miller testified that she has visited Jamel and Egypt in their foster home. Miler stated that Jamel is a very happy boy and responds well to Lipinski and her family. Regarding Egypt, Miller indicated that he can be a bit mischievous but that Lipinski has a very calm way of discipline.
 {¶ 43} LCCS then presented the testimony of appellee on cross-examination. Appellee admitted that she has not always been in compliance with Drug Court. Specifically, appellee agreed that she missed a meeting date due to her house catching on fire. She also agreed that she was not in compliance by allowing a party at her house.
 {¶ 44} Appellee was also questioned regarding the criminal history of Anna, her brother's girlfriend, whom she allowed to move into the house. Appellee indicated that she was not aware of it at the time and that she trusted her brother's suggestion.
 {¶ 45} Appellee was next questioned about her relationships with men. Appellee agreed that she had visited Deon in jail several times despite a civil protection order. Appellee also admitted to having male acquaintances, one "companion" and the rest friends, during the pendancy of the case. She did not feel that the men put her children at risk. *Page 12 
 {¶ 46} Appellee testified that she has turned her life situation around and that there are no people in her home that do not belong there. She also explained that her work situation had improved and that she now works 32 hours per week (opposed to the 50-60 hours she worked when she was reunited with her children.) Further, with regard to the children's beds, appellee stated that there were parts missing from the bed frame and she was trying to arrange to have someone come and weld the beds together.
 {¶ 47} Appellee then presented her case; Debra H., the children's paternal grandmother, testified first. Debra testified that she believed that it was in the children's best interests to be reunited with their mother "so that [they] could all get together and heal this thing." Debra also stated that the children kiss and hug each other during Saturday visitations.
 {¶ 48} Regarding people in appellee's house, Debra indicated that the August incident is the only time she had ever seen anyone like that in the home. Debra indicated that she had visited the home nearly every day. She also admitted that she was the primary caretaker of the children during the brief reunification.
 {¶ 49} Debra stated that after appellee got involved in the drug program "she got cleaner and she got up and moved and cooked more." Debra stated that appellee was more confident with her children and began placing their needs first.
 {¶ 50} Latesha Williams, from Focus, testified that she is a housing care specialist and case manager who works with clients on budgeting, debt reduction, life skills, and parenting. Williams worked with appellee to pay off some high utility bills. Williams *Page 13 
also oversaw appellee's schedule and made certain she was doing all that was required. She made sure appellee kept her house cleaned up. Williams also testified that she attended all of appellee's Drug Court staffings.
 {¶ 51} Williams testified that appellee always complied with her requests and that she never saw evidence of visitors in and out of appellee's house. Williams never saw evidence of drug or alcohol use.
 {¶ 52} The next witness was Denise Majewski-Dean who, at all relevant times, was employed by the Friendly Center as a Help Me Grow Service Coordinator. Majewski-Dean testified that she first met appellee in July 2001, when she began working with appellee to supply the family's basic needs.
 {¶ 53} Majewski-Dean testified that she visited appellee's duplex (a prior residence) on multiple occasions and that it was not very clean; however, Majewski-Dean indicated that she was never concerned about the children's safety or their needs not being met. Majewski-Dean testified that the home visits lasted approximately one hour during which they would discuss how the family was doing; Majewski-Dean would also conduct developmental screenings on the children to ensure that they were reaching developmental milestones. Majewski-Dean did not note any suspected delays or concerns.
 {¶ 54} Majewski-Dean indicated that she never saw appellee interact inappropriately with the children. She stated that appellee used time-outs and redirection which is appropriate for young children. Majewski-Dean also had the opportunity to *Page 14 
attend visits at Children Services. Majewski-Dean admitted the visits were chaotic but that there were "six children at that time in a small room, very excited to see their mom." She further noted that sometimes there were other people present at the visitation and that "the kids were just excited" and that appellee "did her best to redirect." Majewski-Dean testified that she never observed appellee ignoring her children during visitation.
 {¶ 55} During cross-examination, Majewski-Dean acknowledged that she did not visit the Mulberry Street home when the children were there. She also admitted that she had not seen the children in approximately a year and one-half
 {¶ 56} Lucas County Family Drug Court Case Manager, Julie Domschott, testified that appellee was assigned to her case load upon entering Drug Court in August 2003. She testified that appellee was about to complete Drug Court. Domschott stated that appellee completed Fresh Attitudes, she was in a co-dependency group at Unison, she attended the Strengthening Families Program, and she attended the Relapse Prevention program, twice. Domschott testified that appellee, on her own initiative, wanted to redo the program after her children were removed in 2004.
 {¶ 57} Domschott testified that she has seen positive changes in appellee. Domschott stated that appellee's sobriety evidences her ability to internalize things she has learned in going through substance abuse treatment.
 {¶ 58} Appellee was the final witness to testify. Appellee testified that she has worked for a taxi service for the past two years. Appellee stated that her employer was going to make her a first shift dispatcher and her hours would be from 7:00 a.m. to 3:00 p.m., Monday through Friday. *Page 15 
 {¶ 59} Appellee testified that she has filed for a divorce and has cut off all contact with Deon. She testified that her last contact with him was on December 26, 2004.
 {¶ 60} Appellee testified regarding Anna who lived with her for approximately two weeks, after the children had been removed, before appellee told her to leave. Appellee stated that one night she was asleep and woke up to laughing. She went downstairs and saw Anna drinking with a man she did not know. Anna had been at work when appellee went to bed. Appellee testified that she voluntarily reported the incident to her caseworker.
 {¶ 61} Appellee testified that in the past 17 years she has had intimate relationships with four men; Henry, who is Anthony's father, David, who is Courtney's father, Rick, whom she was with for eight years, and Deon. She and Deon got together in 1998, and married in 2000.
 {¶ 62} Appellee admitted that she was responsible for the events which led to her children's removal. She stated that if the children were returned to her she now has transportation to get them to school, she now has more job flexibility if a problem arose, she has a good support network, she has a computer in the home and can help them with homework, and she has learned a lot about discipline from the Strengthening Families program. Appellee testified that there will be no drinking in her home, the only person she associates with and allows in her home is a long-time friend, Bonnie, who has appellee's daughter, Courtney, living with her. Appellee also testified that since August 2004, she has had no visits from LCCS. *Page 16 
 {¶ 63} During cross-examination, appellee was questioned regarding her past choices in men. Appellee stated that her addiction caused her to associate with other addicts. Appellee stated that if she found out about a criminal history, she would no longer be with that person.
 {¶ 64} Appellee agreed that the two drunken men at her house and Anna were not safe to be around her children. Appellee also admitted that one of the men gave her a hickey during the party; she indicated that she was not in a relationship with him. LCCS then rested.
 {¶ 65} On October 12, 2005, the trial court, on the record and before the parties, announced its decision. The court determined that, pursuant to Juv.R. 29(F)(2)(b), it would order a "phased reunification" of the children and that LCCS would maintain protective supervision for not more than six months. The court further ordered appellee to submit to random urinalysis and stated that it would be considering who the primary caretaker of the children is as well as how the divorce proceedings are being pursued.
 {¶ 66} On October 21, 2005, LCCS filed a motion for reconsideration of the court's temporary orders. LCCS argued that Juv.R. 29(F)(2)(b) does not apply to dispositions and that the court's use of the rule violates the legislative intent of R.C. 2151.353 and .415 which is to prevent children from remaining in foster care under temporary orders. Appellee opposed the motion.
 {¶ 67} On November 14, 2005, the trial court granted LCCS's motion for reconsideration. On reconsideration, the court denied LCCS's motion for permanent custody. This appeal followed. *Page 17 
 {¶ 68} LCCS now raises the following three assignments of error:
 {¶ 69} "I. The evidence presented to the trial court supported an award of permanent custody to Lucas County Children Services.
 {¶ 70} "II. The evidence presented to the trial court supported an award of permanent custody pursuant to ORC 2151.414(B)(1)(d).
 {¶ 71} "III. The denial of permanent custody of Ckalvin S. was against the manifest weight of the evidence."
 {¶ 72} In its first assignment of error, LCCS argues that the evidence presented at trial clearly supported a permanent custody finding under R.C. 2151.414. Specifically, LCCS argues that ample evidence was presented demonstrating that appellee failed to remedy the conditions which caused the removal of her children (R.C. 2151.414(E)(1)) and that appellee demonstrated a lack of commitment to her children (R.C.2151.414(E)(4)). Finally, LCCS argued that the evidence it presented supported a finding that an award of custody to LCCS was in the children's best interests (R.C. 2151.414(D)).
 {¶ 73} We first note that the disposition of a child determined to be dependent, abused or neglected is controlled by R.C. 2151.353 and the court may enter any order of disposition provided for in R.C.2151.353(A). However, before the court can grant permanent custody of a child to the agency, the court must determine: (1) pursuant to. R.C2151.414(E) that the child cannot or should not be placed with one of his parents within a reasonable time; and (2) pursuant to R.C.2151.414(D), that the permanent *Page 18 
commitment is in the best interest of the child. R.C. 2151.353(A)(4). R.C. 2151.414(E) provides that, in determining whether or not a child can or should be placed with a parent within a reasonable time, the court shall consider all relevant evidence. If, however, the court determines by clear and convincing evidence that any one of 16 factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time.
 {¶ 74} LCCS argues that R.C. 2151.414(E)(1) and (4) apply to the children, they provide:
 {¶ 75} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 76} "* * *
 {¶ 77} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or *Page 19 
by other actions showing an unwillingness to provide an adequate permanent home for the child."
 {¶ 78} In determining the best interest of the child, R.C. 2151.414(D) directs that the court shall consider all relevant factors, including but not limited to:
 {¶ 79} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 80} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 81} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 82} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 83} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 84} As set forth in the above-quoted statutory sections, the trial court's findings must be supported by clear and convincing evidence. Clear and convincing evidence is that proof which establishes in the mind of the trier of fact a firm conviction as to the *Page 20 
allegations sought to be proved. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 85} At the lengthy trial in this case there was ample testimony presented to demonstrate that appellee had remedied the conditions that caused the children's removal. Appellee had secured a home large enough for the children and had been keeping it in a cleaner, more sanitary condition. Appellee had stable employment and transportation. Appellee had initiated divorce proceedings and had committed herself to refraining from unhealthy relationships with men. Foremost, appellee had maintained sobriety. These positive changes were, in part, the result of appellee's completion of various parenting, domestic violence, and substance abuse programs. Appellee had initiated her involvement in a few of the programs.
 {¶ 86} With regard to the commitment to her children, there was testimony that appellee regularly attended visitation and she volunteered to be a part of her eldest daughter's therapy. Appellee testified that she has learned to put her children's needs before her own.
 {¶ 87} Finally, in reviewing the best interests of the children, we acknowledge that they have formed positive bonds with their foster families. However, there was testimony presented at trial that the children are very happy to see appellee and their siblings during visitation; the children hug and kiss appellee and each other. They are bonded with each other. *Page 21 
 {¶ 88} Based on the foregoing, we find that the evidence clearly and convincingly supports the trial court's denial of LCCS's motion for permanent custody. LCCS's first assignment of error is not well-taken.
 {¶ 89} In its second assignment of error, LCCS contends that the trial court erred when it denied its motion for permanent custody because, pursuant to R.C. 2151.414(B)(1)(d), the motion for permanent custody had been filed after the 12 month annual review. A determination under this section still requires a finding that an award of permanent custody to the agency is in the children's best interests. Based on our disposition of LCCS's first assignment of error, we find LCCS's second assignment of error not-well-taken.
 {¶ 90} In LCCS's third and final assignment of error, it contends that the denial of permanent custody of Ckalvin S. was against the manifest weight of the evidence. LCCS argues that because appellee is not Ckalvin's biological mother and she has not adopted him and that his father, Deon H., is incarcerated, Ckalvin cannot be placed with either of his parents within a reasonable time and that permanent custody to LCCS is in Ckalvin's best interests.
 {¶ 91} As set forth during the trial in this matter, Ckalvin began living with appellee and Deon after his mother died. Ckalvin has bonded with appellee and appellee's biological children. Accordingly, and for that the reasons set forth in our discussion of LCCS's first assignment of error, we find that LCCS's third assignment of error is not well-taken. *Page 22 
 {¶ 92} On consideration whereof, we find that substantial justice was done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant, LCCS, is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerks' expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Mark L. Pietrykowski, P.J. William J. Skow, J., and Thomas J. Osowik, J., CONCUR.
[1] Appellee is also the natural mother of Anthony P., born in October 1988, and Courtney P., born in September 1990. Anthony and Courtney are not involved in this appeal.
[2] LCCS instituted two case numbers because appellee is Ckalvin S.'s stepmother; his natural mother is deceased. Because Ckalvin was living in the home and the claims are identical, we will, until otherwise necessary, refer to them collectively. *Page 1